## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE GEORGE TOWN CLUB AT SUTER'S TAVERN, )<br><br>Petitioner, )<br><br>v. )<br><br>GILBERTO SALAMANCA )<br><br>Respondent. ) | Civil Action<br>No. 1:06cv02181 (EGS) |

## RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITIONER'S MEMORANDUM IN SUPPORT OF ITS PETITION TO COMPEL ARBITRATION

Plaintiff, Gilberto Salamanca, by counsel, respectfully submits this Opposition to Petitioner's Memorandum in Support of its Petition to Compel Arbitration.

## I. STATEMENT OF FACTS

In 1997, Mr. Salamanca was hired by Defendant, The George Town Club at Suter's Tavern (the "Club"), as a part-time parking valet. (Declaration of Gilberto Salamanca dated January 5, 2007 ("Salamanca Decl."), ¶ 2. A true and correct copy of the Salamanca Decl. is attached as Exhibit 1 to Respondent's Answer and Opposition to the Petition to Compel Arbitration.) At or about the time Mr. Salamanca was hired, he was given a copy of the Club's Employee Manual. (Id., ¶ 3.) When he received the Manual, Mr. Salamanca was not asked to sign, nor did he

ever sign, an Acknowledgement of Employee Manual or any sort of acceptance of the Manual or its terms or policies. (Id.)

In 1998, Mr. Salamanca was promoted to a full-time position as a waiter, a position he held for the remainder of his employment with the Club. (Id., ¶ 4.)

In 2000, the Club gave Mr. Salamanca a new Employee Manual that replaced and superseded the previous Manual. (Id., ¶ 5. See also July 2000 Employee Manual (The Manual's cover specifically states "THIS MANUAL REPLACES AND SUPERSEDES ALL PREVIOUS MANUALS" (capitals in original)). A true and correct copy of the complete 2000 Employee Manual is attached to the Salamanca Decl.) When he received the new Employee Manual, Mr. Salamanca was not asked to sign, nor did he ever sign, an Acknowledgement of Employee Manual or any sort of acceptance of the Manual or its terms or policies nor does the Manual itself contain any provision for signatures. (Id., ¶ 5. See also July 2000 Employee Manual.)

The Employee Manual comprises 66 pages, not counting the cover or the five-page Table of Contents. (See 2000 Employee Manual.) The arbitration policy that underlies the Club's Petition to Compel Arbitration appears at pages 59 and 60 of the Manual, bunched together with some 60 other miscellaneous policies under the heading "Other Policies." (See id. at 48-66.)

In September 2006, the Club terminated Mr. Salamanca's employment. (Salamanca Decl. at 4.)

On November 17, 2006, Mr. Salamanca commenced an action in the District of Columbia Superior Court asserting statutory claims against the Club for race discrimination and retaliation under the D.C. Human Rights Act, for wrongful discharge and for violation of the continuing coverage provisions under COBRA (29 U.S.C. § 1162). (A copy of the Mr. Salamanca's Superior Court Complaint is attached as Exhibit B to the Petition to Compel Arbitration.) The Complaint, while referencing a number of provisions from the Employee Manual to show the Club's failure to follow its own policies in relation to its treatment and termination of Mr. Salamanca, does not allege that the Employee Manual is a contract nor does the Complaint assert any claims for breach of the Employee Manual. (Id.)

Concomitant with the filing of Mr. Salamanca's Superior Court action, two other former Club employees, Melaku Teferra and Samuel Romero, brought similar discrimination suits against the Club. (Dated stamped copies of the Teferra and Romero Complaints are attached hereto as Exhibits 1 and 2 respectively.) Messrs. Salamanca, Teferra and Romero are each represented by the same counsel, Kip Schwartz, Esq. In addition, Mr. Schwartz also represents three other Club employees, Iginio Ballarin, Ricky Sanchez and Bernardino Moreno, with respect to the Club's alleged unlawful employment practices.

On December 8, 2006, counsel for the Club demanded that Mr. Salamanca arbitrate his Superior Court claims:

> In your capacity as counsel for Mr. Salamanca, please be advised that The George Town Club intends to assert its rights in connection with its agreement with Mr. Salamanca to arbitrate his claims in the above-referenced action which arise out of his prior employment

3

relationship with the Club.  The Club will pursue arbitration in the American Arbitration Association, under its rules governing employment disputes.

(Petitioner's Demand for Arbitration is attached as Exhibit C to the Petition to Compel Arbitration; see also Petition to Compel Arbitration, ¶ 14.)   The Club's counsel sent similar demands with respect to the Teferra and Romero lawsuits. (True and correct copies of the Club's Teferra and Romero Arbitration Demands are attached hereto as Exhibits 3 and 4 respectively.)

Counsel for Messrs. Salamanca, Teferra and Romero, unaware of the Acknowledgement of Employee Manual and assuming the Club's demands for arbitration rested upon the arbitration policy of the Employee Manual, responded that the arbitration policy in the Employee Manual was not a written arbitration agreement sufficient to support the Club's demand and requested that the Club clarify its position:

> I am in receipt of your demands for arbitration before the American Arbitration Association in connection with the above-referenced Plaintiffs and former employees of The George Town Club. I presume that your demand for arbitration is premised on page 59 of the revised Employee Manual for the George Town Club.  ***Please know that we do not consider the arbitration reference in the Employee Manual to constitute a binding and express agreement to arbitrate. Is it your position that the Employee Manual creates a contract between the employees and the Club?***

(Letter from Kip Schwartz to Amy Bess dated December 12, 2006 (emphasis added). A true and correct copy of Mr. Schwartz's December 12, 2006, letter is attached as Exhibit 3 to the Answer to the Petition to Compel Arbitration.)

The Club's response made clear that the demands for arbitration were not premised upon the arbitration policy of the Employee Manual but rather upon the

separate and independent arbitration agreements set forth in the Acknowledgement

of Employee Manual:

> In response to your letter of earlier today in response to our notice of intent to arbitrate these claims, your clients have apparently not provided you with the full record.  Your clients have agreed to arbitrate all disputes arising out of their prior employment relationship with the George Town Club, and have expressly consented to the jurisdiction of the United States District Court for the District of Columbia for all purposes in connection with such arbitration.  ***(See attached agreements.)***  Please note that I misspoke when I designated AAA arbitration and hereby withdraw that designation.  ***The agreements signed by your clients*** provide the method for selecting arbitrators and the Club expects the parties will abide by that method.

(Letter from Amy Bess to Kip Schwartz dated December 12, 2006 (emphasis added).

A true and correct copy of Ms. Bess' December 12, 2006, letter is attached as Exhibit

4 to the Answer to the Petition to Compel Arbitration.)

The "attached agreements" "signed by your clients" upon which the Club

premised its demands for arbitration were three Acknowledgments of Employee

Manual signed by Messrs. Teferra, Romero and Ballarin.  The Club did not produce

an Acknowledgment of Employee Manual for Mr. Salamanca, because no such

document exists.   (True and correct copies of the Teferra, Romero and Ballarin

Acknowledgements of Employee Manual are collectively attached to the Bess Letter

dated December 12, 2006; Salamanca Decl., ¶¶ 3, 5.)  The Acknowledgments of

Employee Manual expressly provide that the Employee Manual is ***not*** a contract

and include a separate and independent arbitration agreement between the Club

and the particular employee:

> I have received and read (or had read to me) the Historic George Town Club Employee Manual and agree to abide by and observe the policies

and procedures described therein.  I understand that this manual supersedes all previous manuals.

***I understand that nothing in the Manual may be construed to be an expressed or implied contract of employment, but rather an overview of working policies and benefits, that the policies and benefits may change from time-to-time as business necessitates.***

I further agree that any controversy arising out of, or related to, my employment with the Club, including but not limited to controversy concerning equal employment opportunity rights created by federal law and by the law of the District of Columbia, shall be resolved by arbitration, pursuant to the Federal Arbitration Act, and that the method of selecting arbitrators is that set forth in the Manual.  I also consent to the jurisdiction of the United States District court for the District of Columbia for all purposes in connection with arbitration.

I understand that it is a condition of my employment that I read (or have read to me) this manual.

(Acknowledgement of Employee Manual (emphasis added).)

On December 13, 2006, counsel for Mr. Salamanca acknowledged receipt of the Acknowledgments of Employee Manual for Messrs. Teferra, Romero and Ballarin and requested copies of any such Acknowledgement for Messrs. Salamanca, Moreno or Sanchez.  (See Letter from Kip Schwartz to Amy Bess dated December 13, 2006.  A true and correct copy of Mr. Schwartz' December 13, 2006, letter is attached hereto as Exhibit 5.)

The Club did not respond to Mr. Schwartz' December 13, 2006 request and has never produced an Acknowledgment of Employee Manual for Mr. Salamanca. Instead, on December 20, 2006, the Club reasserted its demand that the Salamanca, Teferra and Romero Superior Court actions be arbitrated:

As you are aware, The George Town Club contends that each of your clients agreed to binding arbitration of their claims under the Federal Arbitration Act ("FAA"), and consented to the jurisdiction of the United

States District Court for the District of Columbia for all purposes in connection with arbitration. Contrary to the arbitration agreements, your clients improperly filed the subject actions in The Superior Court for the District of Columbia and gave refused my client's demand for arbitration in lieu of litigation, thereby forcing The George Town Club to seek an order compelling arbitration from the United States District Court for the District of Columbia since the parties agreed that jurisdiction for all purposes concerning arbitration lies in that court.

(Letter from Amy Bess to Kip Schwartz dated December 20, 2006. A true and correct copy of Ms. Bess' December 20, 2006, letter is attached hereto as Exhibit 6.)

On December 21, 2006, counsel for Messrs. Salamanca, Teferra and Romero agreed to dismiss the Teferra and Romero claims against the Club in favor of arbitration in accordance with the signed arbitration agreements set forth in the Acknowledgments of Employee Manual; however, because there is no such signed arbitration agreement for Mr. Salamanca, counsel would not agree to dismiss Mr. Salamanca's claims. (See Letter from Kip Schwartz to Amy Bess dated December 21, 2006. A true and correct copy of Mr. Schwartz's December 21, 2006, letter is attached hereto as Exhibit 7.)

On December 22, 2006, the Club filed its instant Petition to Compel Arbitration. Despite the Club's numerous and consistent prior assertions that arbitration was required not by the arbitration policy contained in the Employee Manual but by the signed arbitration agreement set forth in the Acknowledgement of Employee Manual, the Club now contends that arbitration is required by the Employee Manual. The Club's position is specious and its Petition to Compel Arbitration must be rejected.

## II.  <u>STANDARD OF REVIEW</u>

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." <u>AT&T Tech., Inc. v. Communication Workers of America</u>, 475 U.S. 643, 647-48 (1986). "Arbitration under the [Federal Arbitration Act ("FAA")] is a matter of consent, not coercion. . . ." <u>Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.</u>, 489 U.S. 468, 478-79 (1989) ("FAA does not require parties to arbitrate when they have not agreed to do so. . . .").

## A.  <u>Issue to be Decided.</u>

"For the Court to require arbitration under the FAA, it must be able to conclude that the parties to the contract explicitly agreed to arbitrate the dispute at issue." <u>Brown v. Dorsey & Whitney, LLP</u>, 267 F. Supp. 2d 61, 80 (D.D.C. 2003).  To determine whether the parties explicitly agreed to arbitrate the disputes in question the court undertakes a two-step inquiry: first, it "must decide whether the parties entered into a valid and enforceable arbitration agreement;" and then, if they did, "whether the arbitration agreement encompasses the claims raised in the complaint." <u>Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Sys., Inc.</u>, 448 F. Supp. 2d 64, 68 (D.D.C. 2006).

For purposes of the instant Petition to Compel Arbitration, the court need address only the first question – whether there is a valid and enforceable arbitration agreement between the Club and Mr. Salamanca.

**B.    Substantive Analysis and Burden of Proof.**

Whether there is a written agreement to arbitrate enforceable under the FAA is a question of state law. E.g., First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Under applicable District of Columbia law, a valid and enforceable contract does not exist unless there has been a meeting of the minds as to all material terms with the intent to be legally bound. Bailey v. Federal Nat. Mortgage Ass'n, 209 F.3d 740, 746 (D.C. Cir. 2000) (citing Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1977) ("In order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract.")).

The party asserting the existence of a contract, in this case, the Club, has the burden of proving its existence. Id.; see also Booker v. Robert Half Intl, Inc., 315 F. Supp. 2d 94, 99 (D.D.C. 2004), aff'd, 413 F.3d 77 (D.C. Cir. 2005); Sapiro v. Verisign, 310 F. Supp. 2d 208, 212 (D.D.C. 2004).

**C.    Legal Standard for Deciding the Issue Presented.**

"If the party opposing arbitration contends that no agreement to arbitrate was entered, this effectively raises the issue of whether there was a meeting of the minds on the agreement to arbitrate, and the standards for resolving a summary judgment motion pursuant to Federal Rule of Civil Procedure 56 should be applied." Stromberg, 448 F. Supp. 2d at 68; Hughes v. CACI, Inc., 384 F. Supp. 2d 89, 93 (D.D.C. 2005); Booker, 315 F. Supp. 2d at 99.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial responsibility of informing the district court of the basis for its motion and of establishing, that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Institut Pasteur v. Chiron Corp., 315 F. Supp. 2d 33, 37 (D.D.C. 2004) ("The party seeking to compel arbitration bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.") "The district court, when considering a petition to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made between the parties, should give the opposing party the benefit of all reasonable doubts and inferences that may arise." Institut Pasteur, 315 F. Supp. 2d at 37; see also Hughes v. CACI, Inc., 384 F. Supp. 2d at 94; Brown, 267 F. Supp. 2d at 66-7.

### III. **ARGUMENT**

In this case, the Club relies solely upon the arbitration policy set forth in its Employee Manual as the parties' written agreement to arbitrate. In context of the applicable standards of review, however, to succeed on the instant Petition to Compel Arbitration, the Club must establish, based upon properly supported facts that are not subject to genuine dispute, that the arbitration policy in the Employee Manual represents a 'meeting of the minds' as to arbitration of claims related to Mr.

Salamanca's employment with the Club and that Mr. Salamanca intended to be legally bound thereby.  As demonstrated below, the Club has not, indeed cannot, meet its burden.

## A.    The Presumption Favoring Arbitration Applies Only to the Interpretation of Arbitration Agreements Not to Whether an Agreement Exists.

The Club begins its argument by reciting the well-worn presumption favoring arbitration and the proposition that doubts concerning the scope of arbitration should be resolved in favor of arbitration.  (Memorandum in Support of Petition to Compel Arbitration at 3.)  To be clear, however, that presumption applies only to the interpretation of arbitration agreements and not to the question of whether there is an agreement in the first place.  Thus, the Supreme Court has stated that:

> The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so.  Because the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements, we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement.

E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293-94 (2002) (internal quotation marks and citations omitted).  See also Dumais v. American Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002) ("The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement." (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995)); Pearce v. E.F. Hutton Group, Inc., 828 F.2d 826, 829 (D.C. Cir. 1987) ("Whereas doubts about the meaning of a contract are generally to be resolved

by reference to the intention of the parties, the federal policy favoring arbitration counsels that doubts about the intended scope of an agreement to arbitrate be resolved in favor of the arbitral process.").

**B.    There is No Written Agreement for Arbitration Between the Club and Mr. Salamanca.**

It is generally accepted that a 'meeting of the minds' sufficient to create an enforceable contract under District of Columbia law "is most clearly evidenced by the terms of a signed written agreement." Emeronye v. CACI, Int'l, 141 F. Supp. 2d 82, 86 (D.D.C. 2001) (citing Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995); see also Booker, 315 F. Supp. 2d at 100; Sapiro, 310 F. Supp. 2d at 212.   It is undisputed that there is no signed written agreement for arbitration between the Club and Mr. Salamanca.

Lacking any signed written arbitration agreement, the Club relies on the arbitration policy set forth at pages 59 and 60 of the Club's 66 page Employee Manual as the written arbitration agreement required by the FAA.   That policy, however, is not an explicit written arbitration agreement sufficient to support the Club's demand for arbitration.   Indeed, the District of Columbia Court of Appeals has stated that "the unilateral promulgation by an employer of arbitration provisions in an Employee Handbook does not constitute a 'knowing agreement' on the part of an employee to waive a statutory remedy provided by civil rights laws." Bailey, 209 F.3d at 746-47 (quoting Nelson v. Cyprus Bagdad Copper Corp., 119 F.3d 756, 762 (9th Cir. 1997) and citing Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, 79-82 (1998); Mohave Elec. Coop v. NLRB, 206 F.3d 1183 (D.C. Cir.

2000); <u>Cole v. Burns Int'l Security Servs.</u>, 105 F.3d 1465, 1482 (D.C. Cir. 1997)); <u>see</u> <u>also</u> <u>Phox v. Allied Capital Advisors, Inc.</u>, 1997 WL 198115, *1 (D.D.C. April 14, 1997) ("[P]laintiff does not appear to have knowingly and voluntarily entered into an agreement to arbitrate his statutory claims.  There is no evidence that plaintiff signed the employee handbook or otherwise acknowledged that he fully understood and agreed to any of its provisions.") (a true and correct copy of this unreported decision is attached hereto as Exhibit 8.)).

In fact, the Employee Manual itself gainsays a contractual effect, providing instead that "[i]t is designed to answer many of your questions about the practices and policies of the Club, what you can expect from the Club, and what the Club expects from you."  (Employee Manual at 10.)  Nor does the Employee Manual provide for a particular term of employment or any provisions that limit the Club's ability to terminate employees without cause.  Thus, the Employee Manual expressly states that "[a]ll employment and compensation with the Club is 'at will' which means that your employment can be terminated with or without cause, and with or without notice, at any time, at the option of either the Club or yourself, except as otherwise provided by law."  (<u>Id.</u>)

Notwithstanding the Employee Manual's facial lack of contractual intent as well as the D. C. Circuit's position on the unenforceability of arbitration policies contained in employee manuals, the Club asserts that the Employee Manual's arbitration policy constitutes an explicit written agreement to arbitrate between the Club and Mr. Salamanca because the parties' conduct evidences an intention to be

legally bound.  (See Memorandum in Support of Petition to Compel Arbitration at 6-7.)  As demonstrated below, the Club's 'conduct of the parties' argument is not just factually and legally flawed, it is disingenuous.

> **1.    The Club's own conduct demonstrates that the Club does not consider the arbitration policy of the Employee Manual to be a valid and enforceable contract.**

The Club has sporadically required its employees sign an "Acknowledgment of Employee Manual" that expressly provides that the Employee Manual is **_not_** a contract and that specifically includes a separate and independent arbitration agreement between the Club and the employee:

> I have received and read (or had read to me) the Historic George Town Club Employee Manual and agree to abide by and observe the policies and procedures described therein.  I understand that this manual supersedes all previous manuals.
>
> **_I understand that nothing in the Manual may be construed to be an expressed or implied contract of employment, but rather an overview of working policies and benefits, that the policies and benefits may change from time-to-time as business necessitates._**
>
> I further agree that any controversy arising out of, or related to, my employment with the Club, including but not limited to controversy concerning equal employment opportunity rights created by federal law and by the law of the District of Columbia, shall be resolved by arbitration, pursuant to the Federal Arbitration Act, and that the method of selecting arbitrators is that set forth in the Manual.  I also consent to the jurisdiction of the United States District court for the District of Columbia for all purposes in connection with arbitration.
>
> I understand that it is a condition of my employment that I read (or have read to me) this manual.

(Acknowledgement of Employee Manual (emphasis added).)

In fact, the Club has previously demanded arbitration in this case – as well as for claims brought by other Club employees – based, not on the Employee

Manual, but on the separate and independent arbitration agreement set forth in the Acknowledgement of Employee Manual. (<u>See</u> Bess Letter dated December 12, 2006.) Thus, in response to counsel for Messrs. Salamanca, Teferra and Romero's opposition to the Club's initial demand for arbitration on the specific ground that the arbitration policy in the Employee Manual is not a written arbitration agreement, counsel for the Club asserted:

> In response to your letter of earlier today in response to our notice of intent to arbitrate these claims, your clients have apparently not provided you with the full record. ***Your clients have agreed to arbitrate all disputes arising out of their prior employment relationship with the George Town Club, and have expressly consented to the jurisdiction of the United States District Court for the District of Columbia for all purposes in connection with such arbitration. (See attached agreements.)*** Please note that I misspoke when I designated AAA arbitration and hereby withdraw that designation. ***The agreements signed by your clients*** provide the method for selecting arbitrators and the Club expects the parties will abide by that method.

(Bess Letter dated December 12, 2006 (emphasis added).)

Certainly the Club's assertion set forth in the Acknowledgement of Employee Manual that the Employee Manual is not to be construed as an express or implied contract of employment but only "an overview of working policies and benefits" is compelling evidence of the Club's intention with respect to whether the arbitration policy contained in the Employee Manual constituted a valid and enforceable contract. Indeed, if the Club honestly considered the arbitration policy in the Employee Manual to be a valid and enforceable arbitration agreement, it would not have needed to set forth a separate arbitration agreement in the Acknowledgement of Employee Manual.

The Club's intention that the arbitration policy of the Employee Manual was not to be a contract is further demonstrated by the Club's own initial arbitration demands, in this case and for Messrs. Teferra and Romero, that relied, not on the Employee Manual, but on the arbitration provision set forth in the Acknowledgement of Employee Manual.

Not only does the Club's prior inconsistent reliance on the arbitration provision set forth in the Acknowledgement of Employee Manual demonstrate that the Employee Manual was not intended to be a contract, such conduct gives rise to an affirmative estoppel of the Club's instant contention in support of its Petition to Compel Arbitration that the Employee Manual is a contract.  Thus, having disclaimed that the Employee Manual is a contract, having asserted that the Manual is merely "an overview of working policies and benefits," and having previously asserted that arbitration is required, not by the Employee Manual, but by the separate and independent arbitration agreement set forth in the Acknowledgement of Employee Manual – which Mr. Salamanca never signed – the Club is estopped from claiming that the Employee Manual is a contract and, in particular, that the arbitration policy set forth therein is a "written agreement for arbitration" sufficient to compel arbitration under Section Four of the FAA.  <u>See</u>, <u>e.g.</u>, <u>Prince Constr. Co., Inc. v. District of Columbia Contract Appeals Bd.</u>, 892 A.2d 380, 386-387 (D.C. 2006) (estoppel precludes party from seeking advantage by taking contradictory positions.)

The Club's contention that the arbitration policy set forth in the Employee Manual is a valid and enforceable arbitration agreement is inconsistent with the Club's own prior conduct and expressions of intent; that contention is, therefore, properly rejected and the Club's Petition to Compel Arbitration properly denied.

### 2.     Mr. Salamanca has done nothing to affirmatively express an intention to enter into an arbitration agreement.

Notwithstanding its own prior position that the Employee Manual is not a contract, the Club argues that the arbitration policy should, nevertheless, be enforced as a contract against Mr. Salamanca because he continued to work for the Club after receiving the Manual and never contested the arbitration policy.  (See Memorandum in Support of Petition to Compel Arbitration at 6-7.)   As demonstrated below, the Club's argument is legally incorrect.

### a.     The lack of objection to the arbitration policy is not an affirmative expression of assent to arbitrate.

The Club asserts that, because Mr. Salamanca never contested the arbitration policy set forth in the Employee Manual, he must be held to have agreed to the policy.  That argument, however, was specifically rejected by the D.C. Circuit in Bailey v. Federal Nat. Mortgage Ass'n, 209 F.3d 740, 745-46 (D.C. Cir. 2000). There, the employer made precisely the same argument that the Club attempts here: "Fannie Mae persists in arguing that there was an 'agreement' between the parties because Mr. Bailey did not unequivocally and effectively voice his opposition to the new policy."  The Circuit Court found the employer's argument to be logically flawed and a *non sequitur*:

[T]he argument has a false premise. The question is not whether Mr. Bailey effectively rejected what his employer proposed, for he had no obligation even to respond to Fannie Mae's proposal. ***The issue is whether Mr. Bailey did something to indicate that he intended to enter into an agreement with Fannie Mae so as to bind himself to pursue his statutory claims of employment discrimination in arbitration.***

\* \* \*

Fannie Mae's principal claim is that Mr. Bailey agreed to a new arbitration policy because he did not positively reject it. This is a *non sequitur*. Even if we accepted the premise – which we do not, because the District Court's finding to the contrary is not clearly erroneous – it would not follow that Mr. Bailey's failure to reject a proposal, without more, evidenced his assent to be bound. District of Columbia law clearly requires a "meeting of the minds" as to all material terms for a contract to be formed. There was no "meeting of the minds" in this case, because Mr. Bailey did nothing whatsoever to embrace the employer's proposal.

Bailey, 209 F.3d at 745-46 (emphasis added).

That Mr. Salamanca's did not affirmatively contest the policy does not constitute an expression of assent sufficient to demonstrate a 'meeting of the minds' so as to create a valid and enforceable agreement to arbitrate.

### b.  Continued employment is not an affirmative expression of assent to arbitrate.

The Club also argues that the arbitration policy of the Employee Manual should be enforced as a contract against Mr. Salamanca because he continued to work for the Club after receiving the Manual. (See Memorandum in Support of Petition to Compel Arbitration at 6-7.) Like the lack of objection argument discussed above, this Circuit has also rejected continued employment as a basis for finding an employee's assent to an arbitration policy set forth in an employee manual. See Bailey, 209 F.3d at 746-47 (Mr. Bailey's continued employment with

18

Fannie Mae surely was not an indication that he intended to be bound by the arbitration policy."); <u>Cole v. Burns Int'l Security Servs.</u>, 105 F.3d 1465, 1482 (D.C. Cir. 1997) ("We do not assume, however, that an employer has a free hand in requiring arbitration as a condition of employment."); <u>Phox</u>, 1997 WL 198115, *1 ("Defendants argue that plaintiff assented to [the arbitration policy] by maintaining his job after the handbook was distributed and by following the conflict resolution procedures detailed in the handbook.  Those actions do not establish voluntary and intelligent assent.")

The Club tries to claim that Mr. Salamanca assented to the arbitration policy by *commencing* employment with the Club.  That argument, however, ignores the fact that the Employee Manual that it gave Mr. Salamanca upon the commencement of his employment was replaced and superseded three years later by the current form of the Manual.  <u>See</u> July 2000 Employee Manual (The Manual's cover specifically states "THIS MANUAL REPLACES AND SUPERSEDES ALL PREVIOUS MANUALS" (capitals in original)).  Thus, the only Employee Manual that presently exists and that can even remotely apply to the instant Petition to Compel Arbitration is the 2000 version of the Employee Manual and Mr. Salamanca was already employed when that Manual became effective.

## IV.  <u>CONCLUSION</u>

Consistent with applicable District of Columbia law, the Club has the burden to prove, based upon properly supported facts that are not subject to genuine dispute, that the arbitration policy in the Employee Manual represents a 'meeting

of the minds' as to arbitration of claims related to Mr. Salamanca's employment with the Club and that Mr. Salamanca intended to be legally bound thereby. The Club has not satisfied its burden.

As a matter of law, Mr. Salamanca's continued employment and failure to contest the Club's unilateral adoption of the arbitration policy set forth in the operative 2000 Employment Manual does not establish assent to the arbitration policy. Moreover, the Club's own conduct – disclaiming that the Employee Manual is a contract, asserting that the Manual is merely "an overview of working policies and benefits," and having previously asserted that arbitration is required, not by the Employee Manual, but by the separate and independent arbitration agreement set forth in the Acknowledgement of Employee Manual (which Mr. Salamanca never signed) – conclusively establishes that not even the Club considered the Employee manual to be a valid and enforceable contract.

The arbitration policy set forth at pages 59 and 60 of the Club's 66 page Employee Manual is not a valid and binding written agreement to arbitrate. Because a party may not be compelled to arbitrate a dispute which he has not explicitly and expressly agreed to arbitrate, the Club's Petition to Compel Arbitrate based solely upon its non-contractual arbitration policy must be denied.

Respectfully submitted,

THOMPSON HINE LLP


Dated: February 16, 2007      By:_____/s/ Kip Schwartz_____

                        Christopher "Kip" Schwartz (D.C. Bar #4 44650)

                        C. Dennis Southard IV (D.C. Bar # 448190)

                        1920 N Street, N.W., Suite 800

                        Washington, D.C. 20036

                        Telephone - (202) 331-8800

                        Facsimile – (202) 331-8330

                        *Counsel for Respondent, Gilberto Salamanca*

## <u>CERTIFICATE OF SERVICE</u>

All parties are represented by counsel to whom automatic notice of filing is sent by the Court's CM/ECF system; pursuant to Local Rule 5.4(d), such notice operates as service of the electronically filed document.

<u>        /s/ Kip Schwartz        </u>
Christopher "Kip" Schwartz

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT      )
SUTER'S TAVERN,                  )
                                    )
        Petitioner,         )
                                    )
      v.                    )
                                    )
GILBERTO SALAMANCA         )
                                    )
        Respondent.      )
                                    )

Civil Action
No. 1:06cv02181 (EGS)

**RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
<u>OF ITS PETITION TO COMPEL ARBITRATION</u>**

# EXHIBIT 1

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

|  |  |
|---|---|
| MELAKU TEFERRA,<br>     6802 Earchester Court<br>     Springfield, VA 22152 | )<br>)<br>)<br>) |
| Plaintiff, | )   Civil Action No.   0008409-06<br>) |
| v. | )<br>) |
| THE GEORGE TOWN CLUB AT<br>SUTER'S TAVERN, INC.<br>1530 Wisconsin Avenue, NW<br>Washington, DC 20007 | )<br>)<br>)<br>) |
| and | )<br>) |
| LAURENT LALA, an individual<br>8201 Taunton Place<br>Springfield, VA 22152-2428 | )<br>)<br>)<br>) |
|  | )<br>)<br>) |
| Defendants. | )<br>) |

*RECEIVED*
*Civil Clerk's Office*
*NOV 2 0 2006*
*Superior Court of the*
*District of Columbia*
*Washington, D.C.*

### COMPLAINT AND JURY DEMAND

Plaintiff, Melaku Teferra, by and through his undersigned counsel, for his Complaint

against the Defendants, The George Town Club at Suter's Tavern, Inc. ("Club") and Laurent Lala

("Lala"), alleges and avers as follows:

### NATURE OF THE ACTION

1.     This is an action under the District of Columbia Human Rights Act (DCHRA),

D.C. Code § 2-1401.01, <u>et seq</u>., to remedy Defendant Club's discrimination, harassment, and

retaliation against Plaintiff in his employment.  This action also involves claims of assault and

battery against Defendant Lala and claims of wrongful discharge and intentional infliction of emotional distress against the Club. Finally, this action involves a claim for unpaid wages pursuant to D.C. Code § 32-1301, et seq.

## PARTIES

2.    Plaintiff, Melaku Teferra, is an individual resident of Virginia and a former employee of the Defendant Club who held the position of Valet Manager for over eight years before being demoted and later fired.

3.    Defendant Club is a private dinner club located in the District of Columbia and organized as a non-profit corporation under the laws of the District of Columbia. It is an employer as defined by D.C. Code § 2-1401.2 (10).

4.    Defendant Lala is an individual employed by the Club as the Food and Beverage Manager.

## JURISDICTION

5.    The Court has subject matter jurisdiction over this case pursuant to District of Columbia Code § 11-921.

6.    The Court has personal jurisdiction over the Defendant Club in this case because the Defendant Club is organized under the laws of the District of Columbia and maintains its principal place of business in the District of Columbia. This Court also has jurisdiction over Defendant Lala pursuant to § 13-422 because he transacts business in the District of Columbia and has caused tortious injury within the District of Columbia.

## FACTS

7.    Mr. Teferra is an immigrant from Ethiopia and now a permanent resident.

8.    Mr. Teferra turned 62 years old on September 22, 2006.

9.    The Club hired Mr. Teferra in October 1997 to work as the Club's full-time Parking Valet Manager.

10.    As the Parking Valet Manager, Mr. Teferra had an array of duties, including parking and retrieving cars himself and supervising lower-level parking valets.

11.    At the time of his hire, Mr. Teferra was given an employee manual.

12.    The Club's management distributed a revised employee manual ("Manual" or "Employee Manual") to all of the Club's employees, including Mr. Teferra, in July 2000.

13.    Pages 16 through 18 of the Employee Manual include a section entitled "Unacceptable Activities" which states, in part, as follows:

Occurrences of any of the following violations, because of their seriousness, may result in immediate dismissal without warning:

- Willful violation of any company rule . . . .

*        *        *

- Negligence or any careless action that endangers the life or safety of another person.

- Engaging in criminal conduct or acts of violence, or making threats of violence toward anyone on company premises or when representing the Club; fighting, horseplay or provoking a fight on company property . . . .

*        *        *

- Threatening, intimidating or coercing fellow employees on or off the premises, at any time, for any purpose.

*        *        *

- Malicious gossip and/or spreading rumors; engaging in behavior designed to create discord and lack of harmony; interfering with another employee on the job . . . .

- 3 -

14.   The section entitled "Unacceptable Activities" continues:

> Occurrences of any of the following activities, as well as violations
> of any Club rules or policies, may be subject to disciplinary action,
> including possible immediate dismissal. This list is not all-
> inclusive.
>
> - Any act of harassment, sexual, racial, or other; telling sexist
>   or racial-type jokes; making racial or ethnic slurs.

15.   Pages 18 through 20 of the Employee Manual include a section entitled

"Disciplinary Actions" which provides a three-step disciplinary process that "managers are

expected to follow" in the following manner:

> **Step One: Oral Reminder**  Your manager will meet with you to
> discuss the problem, making sure that you understand the nature of
> the violation and the expected remedy. The purpose of this
> conversation is to remind you of exactly what the rule or
> performance expectation is and also remind you that it is your
> responsibility to meet that expectation.
>
> You will be informed that the Oral Reminder is the first step of the
> discipline procedure. Your manager will document the Oral
> Reminder, which will remain in effect for 3 months.
>
> **Step Two: Written Reminder**  If your performance does not
> improve within the 3 month period, or if you are again in violation
> of Club practices, rules, or standards of conduct, your manager will
> discuss the problem with you, emphasizing the seriousness of the
> problem and the need for you to immediately remedy the problem.
> Following the conversation, your manager will write a memo to
> you summarizing the discussion. The original memo will go to
> you and a copy will be routed to the general manager. That copy
> will be placed in your file. The Written Reminder will remain in
> effect for 6 months.
>
> \*       \*       \*
>
> **Step Three: Decision-Making Leave**  If your performance does
> not improve within the 6 month period following a Written
> Reminder, or if you are again in violation of Club practices, rules,
> or standards of conduct, you will be placed on Decision Making
> Leave. The Decision Making Leave is the final step of the
> disciplinary system. Decision Making Leave is a paid, one-day

disciplinary suspension. Employees on Decision Making Leave will spend the following day away from work deciding whether to correct the immediate problem and conform to all of the company's practices, rules and standards of conduct, or to quit and terminate their employment.

You will be allowed to return to work with the understanding that if a positive change in behavior does not occur, or if another disciplinary problem occurs within the next 12 months, you will be terminated. If you are unwilling to make such a commitment, you may be terminated.

*        *        *

If you commit any of the actions below, or any other action not specified but similarly serious, you will be suspended without pay pending the investigation of the situation. Following the investigation, you may be terminated without any previous disciplinary action having been taken.

1. Theft
2. Falsification of records
3. Failure to follow safety practices
4. Conflict of interest
5. Threat of, or the act of doing bodily harm
6. Willful or negligent destruction of property
7. Use and/or possession of intoxicants, drugs or narcotics
8. Neglect of duty
9. Refusal to perform assigned work or to follow a direct order

16.    The Employee Manual contains a section entitled "Final Paychecks" on page 24 which provides, in part, as follows:

The final paycheck will include all regular wages and salary due for work performed, along with payment for accrued but unused vacation leave, less required taxes and fees for lost equipment or valuables.

17.    The Employee Manual also sets forth an Anti-Harassment Policy which states, among other things, that when an employee becomes aware of harassment, that employee "must" report it to their immediate manager or "any management representative with whom they feel

comfortable." The policy further provides that management is "obligated to take prompt and appropriate action." The policy also specifies that "no adverse employment action will be taken against any employee making a good faith report of alleged harassment."

18.     Upon information and belief, Defendant Lala was hired by Melanie Blesse ("Blesse"), the Club's General Manager, in May 2005, as Maitre d' and Sommelier. At most times relevant to this Complaint, Lala was Mr. Teferra's direct supervisor.

19.     Prior to February 2006, Blesse repeatedly praised Mr. Teferra's job performance and called him her "front gate ambassador" for the Club.

20.     From the first day Lala was hired, Mr. Teferra and Lala had differences about Lala's rude and overbearing management style. Even when Lala and Mr. Teferra were standing in close proximity to one another, Lala would snap his fingers and point rather than speak to him. Mr. Teferra repeatedly asked Lala to treat him and his fellow employees with greater dignity and respect.

21.     Throughout the fall of 2005, Lala frequently made comments of a sexual nature about women Lala met to Mr. Teferra.

22.     Among the comments Lala made were observations that if women (including female members of the Club) stood in a particular fashion, they were "oversexed."

23.     Mr. Teferra expressed to Lala his unease discussing topics of such a sexual nature and how, according to his Orthodox Ethiopian Christian customs and traditions, sex is treated as a highly private topic and occurs only between married couples.

24.     Lala became aware that Mr. Teferra has an 18-year-old daughter who is currently a student at Virginia Polytechnic Institute and State University.

25.    In December 2005, Lala approached Mr. Teferra and asked whether Mr. Teferra's daughter was "into group sex."

26.    In response to Lala's inquiry, Mr. Teferra reminded Lala that to discuss a woman's sexual habits was highly offensive to him, not only because Lala was referring to Mr. Teferra's daughter, but also because an unmarried woman's virginity is held to be very sacred in the Orthodox Ethiopian Christian tradition and culture.

27.    Despite Mr. Teferra's stated concerns, Defendant Lala repeatedly made offensive statements to Mr. Teferra about his daughter and her sexual interests.

28.    On repeated occasions, Defendant Lala demanded that Mr. Teferra give him his daughter's email address so that Lala could contact her.

29.    Defendant Lala told Mr. Teferra that he would like to take Mr. Teferra to a party where the women would undress, be covered in whip cream and other food products, and the men present would lick the food off of their bodies.

30.    Defendant Lala repeatedly told Mr. Teferra that he wanted to contact Mr. Teferra's daughter so that Lala could invite her to the Club to drink with him on his personal account.

31.    Mr. Teferra reported Defendant Lala's inappropriate sexual comments and comments about his daughter to Blesse on numerous occasions; Blesse, however, took no disciplinary action against Lala whatsoever, despite the fact that the statements were clearly "Unacceptable Activities" as described in the Employee Manual.

32.    Mr. Teferra asked Defendant Lala for a day off on New Year's Eve because he had family from out of town visiting. In response, Defendant Lala ridiculed Mr. Teferra and told him that, if he took the day off, he would be suspended for one week without pay.

33.     When Mr. Teferra commented on Lala's disrespectful treatment, Lala became enraged, drew his face to within one inch of Mr. Teferra's nose and began to scream at him.

34.     During the confrontation, Mr. Teferra stepped backwards to avoid Lala but Lala followed him, maintaining his close distance to Mr. Teferra's face while continuing to yell at him.

35.     Lala repeatedly struck Mr. Teferra's chest while he yelled at him.

36.     Later that evening, Lala called Mr. Teferra over to the side of the Club's building and began to berate him again.

37.     During this confrontation, Defendant Lala put his hands around Mr. Teferra's neck and attempted to choke him.

38.     Mr. Teferra backed away and ran around to the front of the building, yelling "stay away" and called for his subordinate to call the police.  Only then did Lala cease his attack.

39.     Mr. Teferra reported Defendant Lala's physical attack to Blesse; however, despite the fact that his actions were clearly "unacceptable activities" as described in the Employee Manual, Blesse took no disciplinary action against Lala.

40.     Within a week of Mr. Teferra's complaint to Blesse, Lala confronted Mr. Teferra and charged that Mr. Teferra had "betrayed" him to Blesse.

41.     During this second confrontation, Lala insisted that Mr. Teferra tell him what he had told Blesse about the December 31, 2005 confrontation.

42.     During the second confrontation, Defendant Lala repeatedly struck Mr. Teferra in the back.

43.     Mr. Teferra also reported the second confrontation to Blesse, who again took no disciplinary action against Lala.

44.    During the fall of 2005 and spring of 2006, Defendant told various Club employees that Mr. Teferra was "useless."

45.    Defendant Lala also told other employees of the Club that he wanted to give Mr. Teferra's job to someone else.

46.    On February 20, 2006, Blesse called Mr. Teferra into her office and told him that he was being demoted from his position of Parking Valet Manager.

47.    Prior to February 20, 2006, Mr. Teferra had never been reprimanded in any manner about his job performance.

48.    When Mr. Teferra asked why he was being demoted, Blesse told him that he was "too old" to continue as Parking Valet Manager and that she wanted to limit the potential for confrontation between Mr. Teferra and Lala.

49.    Mr. Teferra has diabetes, which is controlled through medication, and wears glasses.

50.    Mr. Teferra's health condition and eyesight have remained unchanged since the date Lala was hired to the present time.

51.    At all times relevant to this Complaint, Mr. Teferra maintained a valid driver's license with all endorsements necessary for his job as Parking Valet Manager.

52.    Mr. Teferra remained completely competent and capable of carrying out his job functions as Parking Valet Manager at all times relevant to this Complaint.

53.    Upon information and belief, Blesse misrepresented the reason for Mr. Teferra's demotion to members of the Club by falsely blaming it on a deterioration in his eyesight.

54.    After Mr. Teferra was removed as the Parking Valet Manager, he was replaced by his former subordinate, who is approximately 20 years younger than Mr. Teferra.

55.     As of February 20, 2006, Blesse told Mr. Teferra that he was to fill a newly-created full-time position of "Club Steward."

56.     Blesse told Mr. Teferra that among the job responsibilities of the Club Steward were: (i) receiving deliveries; (ii) monitoring and answering the service doors; (iii) assisting the kitchen with the distribution and storage of delivery items; (iv) special maintenance projects; (v) assisting with front door presence during service hours; and (vi) calling contractors for premises maintenance and repairs as requested by the General Manager.

57.     During his time as Parking Valet Manager, Mr. Teferra earned $11.75 an hour, plus $.50 commission per car collected, plus tips.

58.     During his time as a Club Steward, Mr. Teferra earned $12.25 an hour, but earned no tips or commission.

59.     During his time as a Club Steward, Mr. Teferra forewent approximately $300 of income per month in lost tips.

60.     On April 13, 2006, Blesse again called Mr. Teferra into her office and told him that he was being fired from his position as Club Steward.  Blesse told Mr. Teferra that he was being fired because he "was a liability" and "could get hurt" in some of his job functions, such as going up ladders and carrying packages.

61.     Despite his unchanged health condition, on April 13, 2006, Blesse told Mr. Teferra that he should apply for Social Security disability payments and that she was sure he would receive such payments.

62.     When Mr. Teferra pleaded with Blesse for continued employment, she agreed to keep him on as a porter for 16 hours per week at $12.25 an hour on the condition that he "retire" on September 22, 2006, when he turned 62.

- 10 -

63. During the time Mr. Teferra worked as a porter, and even though Lala was no longer Mr. Teferra's supervisor, Lala frequently followed Mr. Teferra around as Mr. Teferra performed activities such as taking out trash and washing dishes, criticized Mr. Teferra's work, and accused Mr. Teferra of having a "complex."

64. Mr. Teferra worked 16 hours a week as a porter until September 2006, when a part-time janitor quit his job.

65. In early September 2006, Mr. Teferra replaced the part-time janitor and worked 20 hours per week as a janitor at $12.25 an hour.

66. On September 18, 2006, Mr. Teferra was given a paycheck for $70.67. Mr. Teferra was not able to cash the September 18th paycheck from the Club, as the check was returned for insufficient funds. Mr. Teferra incurred a $6.00 charge from his bank for the returned check.

67. On September 22, 2006, despite the fact that he was now occupying the recently opened part-time janitor position, Blesse told Mr. Teferra that she was "sticking to her deal" and that he could only work until September 29, 2006, and would then be fired.

68. Mr. Teferra was fired on September 29, 2006.

69. The last check sent to Mr. Teferra, dated October 4, 2006, was for $285.52.

70. The $285.52 was characterized as "regular pay" on the final pay stub.

71. The Club owed Mr. Teferra at least $1470 for accrued unused vacation pay at the time he was fired.

72. The Club has never compensated Mr. Teferra for his accrued unused vacation pay.

73. Mr. Teferra has been denied eligibility for Social Security disability payments.

74.     As a result of the hostile environment created by Lala and Blesse and the

discriminatorily motivated termination, Mr. Teferra has suffered insomnia, humiliation,

emotional distress, anxiety, depression, and loss of appetite.

## COUNT I
(Age Discrimination against Defendant Club)

75.     Plaintiff incorporates by reference the averments of Paragraphs 1-74, above, as if

fully set forth herein.

76.     Mr. Teferra is a member of a statutorily protected group, as he was 60 to 62 years

old at the time all of the events relevant to this Complaint occurred.

77.     Mr. Teferra was qualified for the position he held as a Parking Valet Parking

Manager, as he had successfully served as a Parking Valet Manager for over eight years without

any criticism of his job performance.

78.     Mr. Teferra's eyesight and health did not worsen at any time relevant to this

Complaint.

79.     Mr. Teferra's ability to carry out his job functions as Parking Valet Manager was

unchanged at all times relevant to this Complaint.

80.     Mr. Teferra was demoted from his full-time, supervisory position as Parking

Valet Manager on February 20, 2006 because of his age, to the largely fictional position of "Club

Steward" with virtually no work assigned, and later had his hours reduced from 40 hours to 16 to

20 hours per week.

81.     Mr. Teferra's position as Valet Parking Manager was subsequently filled by an

employee 20 years younger than he.

- 12 -

82.    The Defendant Club unlawfully discriminated against Mr. Teferra on the basis of his age in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, et seq., and particularly § 2-1402.11.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- declaring that Defendant Club has violated DCHRA by discriminating against Plaintiff on the basis of his age;

- ordering that Defendant reinstate the Plaintiff as an employee with all associated back pay and benefits;

- enjoining any further discriminatory conduct by Club management;

- awarding compensatory damages of at least $ 200,000 to be more fully determined at trial;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate

## COUNT II
(Retaliation against Defendant Club)

83.    Plaintiff incorporates by reference the averments of Paragraphs 1-74 above, as if fully set forth herein.

84.    By complaining to Blesse about Defendant's assault and battery, Lala's general harassment and abuse towards him, and Lala's sexual comments about women in general and Mr. Teferra's daughter in particular, Mr. Teferra engaged in a statutorily protected activity.

- 13 -

85.    Mr. Teferra's demotion from Parking Valet Manager, a position that he had occupied for over eight years, to the newly-created make-work position of "Club Steward," wherein he collected no tip income, constitutes an adverse employment action.

86.    Mr. Teferra's reduction in hours from 40 hours per week to 16 to 20 hours per week constitutes an adverse employment action.

87.    Mr. Teferra's firing from the part-time janitorial position constitutes an adverse employment action.

88.    A causal connection exists between Plaintiff's statutorily protected activity and the adverse employment actions.

89.    The Defendant Club unlawfully retaliated against Mr. Teferra for protected activities in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, et seq., and particularly § 2-1402.61.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- declaring that Defendant Club has violated the DCHRA by retaliating against Plaintiff because of his statutorily protected activity;

- ordering the Defendant Club reinstate the Plaintiff as an employee with all associated back pay and benefits;

- awarding damages of at least $100,000 to be more fully determined at trial;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

- 14 -

## COUNT III
(Wrongful Discharge)

90.    Plaintiff incorporates by reference the averments of Paragraphs 1-74 above as if fully set forth herein.

91.    Although Plaintiff's employment was "at-will" in nature, his demotion and subsequent dismissal were based on age discrimination and/or retaliation, and thus fall under the public policy exception to the at-will employment doctrine.

92.    Plaintiff has suffered damages as a result of his demotion and termination, as he lost his only source of income and suffered anxiety, insomnia, depression, humiliation, and severe emotional distress.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- awarding compensatory damages of at least $200,000 to be more fully determined at trial;

- awarding punitive damages;

- ordering the reinstatement of Plaintiff as an employee with all associated back pay and benefits;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

## COUNT IV
(Intentional Infliction of Emotional Distress against Defendants)

93.    Plaintiff incorporates by reference the averments of Paragraphs 1-74, above, as if fully set forth herein.

94.    In his capacity as an agent of the Club, Defendant Lala engaged in extreme and outrageous conduct by: (i) making frequent statements about women's sexual habits generally, including his statements that certain women were "oversexed," despite Mr. Teferra's communication to Lala that such statements of a sexual nature were highly offensive to him not only as a father, but also because of his Orthodox Ethiopian Christian culture and beliefs; (ii) questioning Mr. Teferra about Mr. Teferra's daughter's sexual behaviors and whether she was "into group sex"; (iii) requesting that Mr. Teferra provide Lala with Mr. Teferra's daughter's email address; (iv) commenting that Lala would like to invite Mr. Teferra to a party where all of the women would undress and be covered in whip cream and other food products; (v) stating that Lala would like to invite Mr. Teferra's daughter to the Club so that she would drink with Lala and that the bill for such drinks could be placed on Lala's personal account; (vi) following Mr. Teferra around the Club's premises; and demeaning Mr. Teferra's job performance; and (vii) physically attacking Mr. Teferra on December 31, 2005, and in January 2006.

95.    As the Club's agent, Defendant Lala committed all of the actions described in the preceding paragraph with the malicious intent to cause Mr. Teferra to suffer severe emotional distress or with reckless disregard as to the effect of his conduct on Mr. Teferra.

96.    As a result of Defendant Lala's actions, Mr. Teferra has suffered severe emotional distress, anxiety, insomnia, depression, loss of appetite, and fear for his personal safety.

97.    Mr. Teferra has suffered damages to his psychological well-being as a result of the Defendants' actions.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendants:

- awarding compensatory damages of at least $100,000, to be more fully determined at trial;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

### COUNT V
(Assault and Battery Against Defendant Lala)

98.    Plaintiff incorporates by reference the averments of Paragraphs 1-74, above, as if fully set forth herein.

99.    Defendant Lala's conduct on December 31, 2005, in approaching Mr. Teferra, striking him in the chest, yelling at him in his face, and attempting to choke Mr. Teferra, caused Mr. Teferra to reasonably apprehend and suffer harmful or offensive contact to his person.

100.    Defendant Lala's conduct in January 2006, after Mr. Teferra had reported the December 31, 2005, incident, whereby Defendant Lala positioned himself in Mr. Teferra's personal space, questioned him about what he had told Blesse and struck him in the back, caused Mr. Teferra to reasonably apprehend and suffer a harmful or offensive contact to his person.

101.    Defendant Lala's intentional actions were intended to bring about harmful or offensive contacts to Mr. Teferra's person and have caused Mr. Teferra to suffer physical and psychological harm.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against Defendant Lala:

- awarding damages of at least $100,000, to be more fully determined at trial;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

## COUNT VI
(Hostile Work Environment against Defendant Club)

102.    Plaintiff incorporates by reference the averments of Paragraphs 1-74, above, as if fully set forth herein.

103.    Mr. Teferra has been subjected to unwelcome harassment by Lala, the Defendant Club's agent, through, but not limited to: (i) Lala's frequent statements about women's sexual habits generally, including his statements that certain women were "oversexed," despite Mr. Teferra's communication to Lala that such statements of a sexual nature were highly offensive to him because of his Orthodox Ethiopian Christian culture and beliefs; (ii) Lala's questions about Mr. Teferra's daughter's sexual behaviors and whether she was "into group sex"; (iii) Lala's request that Mr. Teferra provide him with his daughter's email address; (iv) Lala's comments that he would like to invite Mr. Teferra to a party where all of the women would undress and be covered in whip cream and other food products; (v) Lala's statement that he would like to invite Mr. Teferra's daughter to the Club so that she would drink with him and that the bill for such drinks could be placed on Lala's personal account; (vi) Lala's harassing conduct whereby he followed Mr. Teferra around the Club's premises and demeaned his job performance; and (vii) Lala's physical attacks on Mr. Teferra on December 31, 2005, and in January 2006.

104.    Blesse failed to address Lala's harassing treatment of Mr. Teferra, despite Mr. Teferra's repeated complaints and despite the prohibition of such activities in the Employee Manual.

105.    Lala's actions have been tolerated, condoned and ratified by the Defendant Club.

106.    The unwelcome harassment was severe and pervasive enough to affect the terms, conditions, or privileges of Mr. Teferra's employment and they have caused Plaintiff injuries to his physical and emotional health.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- declaring that Defendant Club has violated DCHRA by creating a hostile work environment for Plaintiff;

- awarding damages of at least $100,000 to be more fully determined at trial;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

## COUNT VII
(Violation of DC Code § 32-1301 et seq.)

107.    Plaintiff incorporates by reference the averments of Paragraphs 1-74 above as if fully set forth herein.

108.    Defendant Club owes Mr. Teferra at least $1,470 for accrued and unused vacation pay at the time he was fired.

109.    Over the course of September 2006, Defendant Club failed to fully pay Mr. Teferra for wages earned.

110.    Defendant Club's acts and omissions have violated D.C. Code § 32-1301 et seq.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against Defendant Club:

- awarding compensatory damages of at least $1,540;

- awarding liquidated damages pursuant to D.C. Code § 32-1308;

- awarding Plaintiff his costs and attorneys fees pursuant to D.C. Code § 32-1308;

- granting such other relief as may be necessary and appropriate.

## JURY DEMAND

Mr. Teferra requests trial by jury as to all issues in this Complaint.

Respectfully submitted,

THOMPSON HINE LLP

By: _____

Christopher "Kip" Schwartz (D.C. Bar No. 444650)
1920 N Street, N.W., Suite 800
Washington, DC 20036
202.263.4157

Counsel for Plaintiff

182871.v2

- 20 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT
SUTER'S TAVERN,

        Petitioner,

      v.

GILBERTO SALAMANCA

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action
No. 1:06cv02181 (EGS)

RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 2



SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| SAMUEL ROMERO,<br>    6556 China Grove Court<br>    Alexandria, VA 22310 | )<br>)<br>)<br>) |
|       Plaintiff, | )  Civil Action No.<br>)<br>) |
| v. | )<br>)    *0008438-06*<br>) |
| THE GEORGE TOWN CLUB AT<br>SUTER'S TAVERN, INC.<br>    1530 Wisconsin Ave. NW<br>    Washington, D.C. 20007 | )<br>)<br>)<br>)<br>) |
|       Defendant. | )<br>) |

## COMPLAINT AND JURY DEMAND

Plaintiff, Samuel Romero, by and through his undersigned counsel, for his Complaint against the Defendant, The George Town Club at Suter's Tavern, Inc. ("Club"), alleges and avers as follows:

## NATURE OF THE ACTION

1.    This is an action brought under the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01, et seq., to remedy Defendant's discrimination, harassment and retaliation of Plaintiff in his employment. Plaintiff also asserts claims for breach of contract, wrongful discharge and for violations of the continuation health insurance coverage requirements mandated by 29 U.S.C. § 1162 ("COBRA").

## PARTIES

2.    Plaintiff, Samuel Romero, is an individual resident of Virginia and a former employee of the Defendant Club for 16 years until he was summarily fired on August 17, 2006.

3.    Defendant Club is a private dinner club located in the District of Columbia and organized as a non-profit corporation under the laws of the District of Columbia. Defendant is an employer as defined by D.C. Code § 2-1401.02(10).

## JURISDICTION

4.    The Court has subject matter jurisdiction over this case pursuant to District of Columbia Code § 11-921 and 29 U.S.C. § 1132.

5.    The Court has personal jurisdiction over the Defendant in this case because the Defendant Club is organized under the laws of the District of Columbia and maintains its principal place of business in the District of Columbia.

## FACTS

6.    Mr. Romero is an immigrant from El Salvador and a legal permanent resident.

7.    Mr. Romero was hired by the Defendant Club as a busboy in 1990.

8.    Mr. Romero worked as a busboy for approximately 3 years before he was promoted to the position of waiter.

9.    In 2000, Mr. Romero was promoted from waiter to the position of head bartender and held that position until his termination in August 2006.

10.    At the time of his hire, Mr. Romero was given an employee manual.

11.    The Club's management distributed a revised employee manual ("Manual" or "Employee Manual") to all of the Club's employees, including Mr. Romero, in July 2000.

12.    Pages 16-18 of the Employee Manual include a section entitled "Unacceptable Activities" which states, in part, as follows:

> Occurrences of any of the following activities, as well as violations of any Club rules or policies, may be subject to disciplinary action, including possible immediate dismissal. This list is not all inclusive.

> - Any act of harassment, sexual, racial, or other; telling sexist or racial-type jokes; making racial or ethnic slurs.

13.    Pages 18 through 20 of the Employee Manual include a section entitled "Disciplinary Actions" which provides a three-step disciplinary process that "managers are expected to follow" in the following manner:

> ***Step One: Oral Reminder***  Your manager will meet with you to discuss the problem, making sure that you understand the nature of the violation and the expected remedy. The purpose of this conversation is to remind you of exactly what the rule or performance expectation is and also remind you that it is your responsibility to meet that expectation.

> You will be informed that the Oral Reminder is the first step of the discipline procedure. Your manager will document the Oral Reminder, which will remain in effect for 3 months.

> ***Step Two: Written Reminder***  If your performance does not improve within the 3 month period, or if you are again in violation of Club practices, rules, or standards of conduct, your manager will discuss the problem with you, emphasizing the seriousness of the problem and the need for you to immediately remedy the problem. Following the conversation, your manager will write a memo to you summarizing the discussion. The original memo will go to you and a copy will be routed to the general manager. That copy will be placed in your file. The Written Reminder will remain in effect for 6 months.

> \*        \*        \*

> ***Step Three: Decision-Making Leave***  If your performance does not improve within the 6 month period following a Written Reminder, or if you are again in violation of Club practices, rules, or standards of conduct, you will be placed on Decision Making

- 3 -

Leave.  The Decision Making Leave is the final step of the
disciplinary system.  Decision Making Leave is a paid, one-day
disciplinary suspension.  Employees on Decision Making Leave
will spend the following day away from work deciding whether to
correct the immediate problem and conform to all of the company's
practices, rules and standards of conduct, or to quit and terminate
their employment.

You will be allowed to return to work with the understanding that
if a positive change in behavior does not occur, or if another
disciplinary problem occurs within the next 12 months, you will be
terminated.  If you are unwilling to make such a commitment, you
may be terminated.

*        *        *

If you commit any of the actions below, or any other action not
specified but similarly serious, you will be suspended without pay
pending the investigation of the situation.  Following the
investigation, you may be terminated without any previous
disciplinary action having been taken.

1.    Theft
2.    Falsification of records
3.    Failure to follow safety practices
4.    Conflict of interest
5.    Threat of, or the act of doing bodily harm
6.    Willful or negligent destruction of property
7.    Use and/or possession of intoxicants, drugs or
      narcotics
8.    Neglect of duty
9.    Refusal to perform assigned work or to follow a
      direct order

14.    The Employee Manual also sets forth an Anti-Harassment Policy which states,

among other things, that when an employee becomes aware of harassment, that employee "must"

report it to their immediate manager or "any management representative with whom they feel

comfortable."  The policy further provides that management is "obligated to take prompt and

appropriate action."  The policy also specifies that "no adverse employment action will be taken

against any employee making a good faith report of alleged harassment."

15.    Page 52 of the Employee Manual provides that "[e]mployees are not permitted to give gifts to guests or suppliers, except for certain promotional 'premiums' imprinted with the Club logo or information."

16.    The Manual contains no prohibitions on giving gifts, including drink samples, to Members.

17.    In 1996, the Club's management gave Mr. Romero a contract that reads in pertinent part:

40 HOUR GUARANTEE:    January, July & August only

18.    Prior to August 2006, Mr. Romero was never reprimanded by the Club's management for his job performance.

19.    Upon information and belief, Laurent Lala ("Lala") was hired by Melanie Blesse ("Blesse"), the Club's General Manager, as Maitre d' and Sommelier in May 2005.

20.    At all times relevant to this Complaint, Lala was Mr. Romero's direct supervisor.

21.    From the time he was hired, Lala frequently made disparaging remarks about the Club's Latino employees to other, non-Latino employees.

22.    Lala stated, among other things, that he did not like having members of the "Latino Mafia" working for him and that he wanted to fire some of the Latino employees.

23.    Lala stated that the Club's Latino workers were all "lazy" and that they were "ignorant," despite the fact that some of the Club's Latino employees had up to 28 years' experience working for the Club.

24.    Lala claimed that the Club's Latino employees were "a bunch of drunkards" who did not "know how to work."

25.    Lala also stated that he preferred to have employees working for him who were "tall and slender" and not "short and fat" like many of the Club's Latino employees.

26.    When a tall, slender, light-skinned waiter was offered a management position at a competing business, Lala offered to grant him a raise so that he would stay, but did not offer to raise the salaries of shorter, heavier, darker-skinned Latino waiters with comparable experience.

27.    In September 2005, Mr. Romero, who had only been making a base salary of $7.00 per hour for over 5 years without a raise, approached Blesse to ask for a small raise.

28.    Despite Mr. Romero's ability to converse in English and the fact that no Members had ever complained about his language skills, Blesse told Mr. Romero that he would have to go to school to improve his English if he ever wanted to see a raise.

29.    In September 2005, Lala suspended Gilberto Salamanca, a Latino waiter, for three days without pay for supposedly refusing to obey orders when he was busy with one group of customers on the second floor and Lala ordered him to also serve another group of customers on the first floor at the same time, despite the fact that Lala was not doing anything at the time and that his position as Maitre d', as described to the waiters by Blesse, was to support the waiters during busy periods.  In fact, for that alleged support, Lala is to receive fourteen percent (14%) of all tips earned by the waiters.

30.    During the fall of 2005, Lala began sending many of the Latino employees of the Club home before their scheduled shifts were completed, often retaining non-Latino employees who were close friends of his in their place.

31.    In November 2005, at a monthly staff meeting of all of the Club's employees, Blesse stated that it would now be prohibited for anyone to speak in Spanish on the Club's premises, even if they were only in the kitchen and regardless of whether Members were present.

32.    Blesse's policy meant that the Latino employees were even prohibited from speaking in Spanish to Members of the Club who were from Latin American countries, even if addressed first in Spanish.

33.    French, Lala's native language, was not prohibited on the Club's premises at any time and Lala and Blesse frequently spoke in French at the Club.

34.    When Mr. Romero complained to Lizette Corro, a Latina member of the Club's Board of Directors about the prohibition on speaking Spanish and how he felt Latino employees of the Club were being mistreated, Blesse threatened to fire him if he ever again spoke to a Board Member about the Club's employment policies and practices.

35.    Throughout the spring of 2006, many of the Latino employees, including Plaintiff, began to complain about decreased wages, reduced hours and Lala's racially abusive treatment.

36.    On June 8, 2006, Blesse suspended Salvador ("Ricky") Sanchez, the Club's banquet manager, for one month without pay for supposed "offenses" he had committed at a private party at the Club on June 3rd, 2006.

37.    To justify Mr. Sanchez's suspension, Blesse alleged, in a letter to Mr. Sanchez, that Mr. Sanchez had removed partially full drinks, thus creating an artificially padded bill, that he had served clearly drunk people multiple drinks at one time, and that his paperwork and accounting work for the event were incorrect and submitted late.

38.    Blesse did not allege in the letter that Mr. Sanchez had served alcohol to underage guests.

39.    Nevertheless, Blesse falsely justified Mr. Sanchez's suspension to Members of the Club by claiming that Mr. Sanchez had served alcohol to underage guests.

40.    At the time of the June 3, 2006, event, Lala was Mr. Sanchez's supervisor.

- 7 -

41.    During the June 3, 2006, event, Lala was in charge of checking and, upon information and belief, did check all of the guests' identifications.

42.    There were no clearly drunk individuals served at the June 3, 2006, party.

43.    Upon information and belief, no minor guests were served alcohol at the June 3, 2006, party.

44.    In July 2006, Mr. Romero repeatedly complained to Blesse about the suspensions of the other employees which he considered to be unfair and due to Lala's discriminatory intent, overbearing micromanagement and refusal to take responsibility for his own mistakes.

45.    Also, in July 2006, Mr. Romero complained to Blesse that his hours had been significantly reduced by Lala and that he had been guaranteed 40 hours per week during the summer months by a 1996 contract.

46.    During June and July 2006, Lala frequently sent Mr. Romero home around 8:00 to 9:00 PM and kept other individuals who were friends of his to tend the main bar until the Club closed around 12:00 PM.

47.    During this same period, Lala regularly told Mr. Romero not to come to work the next day, even though Mr. Romero was scheduled to work.

48.    The employee who Lala frequently kept to tend the main bar after he sent Mr. Romero home or on days when he had told Mr. Romero to not come in to work was Joseph Kashab, a non-Latino part-time bartender who normally tended the secondary bar close to the dance floor.

49.    In July 2006, Mr. Romero, ostensibly a full-time employee, was given only 15 to 20 hours of work per week.

50.   In July 2006, Lala chastised Mr. Romero for giving two free drinks to Members in the hope that they would order such drinks on their next visit, despite the fact that all of the Club's bartenders, and even Lala himself, had previously done so.

51.   Mr. Romero frequently reported Lala's unfair treatment of him and the Latino employees to Blesse, who never disciplined Lala.

52.   In late July 2006, Mr. Romero complained to the Club's then-President, John Guttenberg, about the precipitous decline in hours the supposedly full-time, Latino employees were allowed to work.

53.   In early August 2006, Lala brought several of his friends to the Club and gave them drinks free of charges.

54.   Inviting personal guests to the Club and not charging them for drinks consumed is a flagrant violation of the Club's policies.  Theft is described as an offense punishable by termination under the "Disciplinary Actions" section of the Employee Manual and gifts to guests are expressly prohibited in the Manual.

55.   In the days immediately after Lala's private party with his friends, Mr. Romero reported Lala's violation of Club policy to Blesse.

56.   In response, Blesse took no disciplinary action against Lala.

57.   Instead, Blesse elevated Lala to the position of Food and Beverage Manager in August 2006.

58.   On August 9, 2006, Lala reviewed an "Employee Evaluation Form" with Mr. Romero in which Mr. Romero had given himself classifications of "very satisfactory" and "outstanding" in many areas, including "Cooperative - willingness to work with co-workers" and "Adaptability – able to adjust to new situations."

59.    During the review, Lala berated Mr. Romero for the scores he had given himself and for expressing resentment for the mistreatment he felt that he and the other Latino employees had suffered at Lala and Blesse's hands.

60.    On August 9, 2006, Lala also criticized Mr. Romero's ability to mix drinks fast enough, unreasonably asserting that he should be able to mix complex drinks in one-third the standard time even though Lala himself could not do so.

61.    Mr. Romero challenged Lala's claims about his allegedly poor drink-mixing ability and criticized Lala's abuse of the employees.

62.    Upon information and belief, Lala left a written note for Blesse about his altercation with Mr. Romero stating that he wanted Mr. Romero to be fired.

63.    On August 17, 2006, Blesse called Mr. Romero into her office and claimed that Mr. Romero could not "keep up with the changes" at the Club and summarily terminated him.

64.    At no time did Blesse, Lala, or any other members of the Club's management discipline Mr. Romero, as prescribed by the Employee Manual's discipline procedures.

65.    At no time prior to his firing was Mr. Romero warned, suspended, or disciplined as per Employee Manual procedures.

66.    Upon information and belief, no Members of the Club ever complained about Mr. Romero's services or abilities.

75.    When he was fired, Mr. Romero asked Blesse whether a Member had complained about him and Blesse told him that no one had complained about him.

76.    In late September 2006, Mr. Romero received a letter from the Club demanding that he pay $943 by October 1, 2006, for health insurance coverage for the month of October despite the fact that he had already paid $870 several weeks earlier.

77.    Upon information and belief, $943 is substantially more than 102 percent of the monthly insurance premiums charged under the Club's health insurance plan.

78.    Mr. Romero and his family have been without health insurance coverage since November 1, 2006.

79.    Following Mr. Romero's termination, Joseph Kashab, a part-time, non-Latino employee, was promoted into Mr. Romero's position.

80.    As a result of the Club's condonation and ratification of Blesse's and Lala's acts and omissions, including Mr. Romero's wrongful termination, Mr. Romero has suffered insomnia, anxiety, humiliation, depression, and severe emotional distress.

## COUNT I
### (Race Discrimination)

81.    Plaintiff incorporates by reference the averments of Paragraphs 1-80, above, as if fully set forth herein.

82.    Mr. Romero, a Latino immigrant from El Salvador, is a member of a protected class.

83.    Mr. Romero is qualified for the job of bartender, from which he was terminated, as illustrated by his six years of experience in the position and the absence of complaints or reprimands regarding his job performance.

84.    Mr. Romero's reduction of hours and subsequent termination was based on the characteristic that placed him in a protected class. Other Latino employees were disciplined, suspended, and terminated around the time of Mr. Romero's termination, while other, non-Latino employees were given additional hours to replace the hours taken away from the Latino employees.

85.    Prior to Plaintiff's termination, Lala's conduct and racial slurs, together with Blesse's condonation of same, created a hostile work environment for the Club's Latino employees including Plaintiff.

86.    The Defendant Club unlawfully discriminated against Mr. Romero on the basis of his race in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, et seq., and particularly § 2-1402.11.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- declaring that Defendant has violated the DCHRA by discriminating against Plaintiff both in terms of his unjustified termination and the creation of a hostile work environment;

- ordering that Defendant reinstate Plaintiff, with all associated back pay and benefits;

- enjoining any further discriminatory conduct by Club management;

- awarding compensatory damages of at least $ 200,000, in an amount to be more fully determined at trial;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

## COUNT II
(Retaliation)

87.    Mr. Romero incorporates by reference the averments of Paragraphs 1-80, above, as if fully set forth herein.

88.    In complaining to Blesse and to Board Members about the racially discriminatory treatment of Latino employees by Lala and other management employees, Mr. Romero was

engaged in a statutorily protected activity. Mr. Romero's direct efforts to get Lala to cease his discriminatory and retaliatory behavior were also protected activities.

89.    In reporting Lala's theft of Club resources to Blesse, Mr. Romero also engaged in a statutorily protected activity.

90.    Mr. Romero was subjected to adverse employment actions when his hours were progressively reduced and when he was summarily fired on August 17, 2006.

91.    A causal connection exists between Mr. Romero's statutorily protected activity and the adverse employment actions.

92.    The Defendant Club unlawfully retaliated against Mr. Romero for protected activities in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, et seq., and particularly § 2-1402.61.

93.    Mr. Romero has suffered damages as a consequence of the retaliation, including depression, anxiety, insomnia, and humiliation, and the loss of his only source of income.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- declaring that Defendant has violated the DCHRA by retaliating against Plaintiff because of his statutorily protected activity;

- ordering that Defendant reinstate the Plaintiff as a full-time bartender at the Club with all associated back pay and benefits;

- awarding compensatory damages of at least $ 200,000;

- awarding punitive damages;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

## COUNT III
### (Wrongful Discharge)

94.    Plaintiff incorporates by reference the averments of Paragraphs 1-80 above, as if fully set forth herein.

95.    Although Plaintiff's employment was "at-will" in nature, his dismissal was based on race and/or retaliation, and thus falls under the public policy exception to the at-will employment doctrine.

96.    Plaintiff has suffered damages as a result of his termination, as he lost his only source of income and suffered anxiety, insomnia, depression, humiliation and emotional distress.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- awarding compensatory damages of at least $200,000, to be more fully determined at trial;

- awarding punitive damages;

- granting such other relief as may be necessary and appropriate.

## COUNT IV
### (Breach of Contract)

97.    Mr. Romero incorporates by reference the averments of Paragraphs 1-80, above, as if fully set forth herein.

98.    A contractual employment relationship existed between Mr. Romero and the Defendant Club, with the guidelines as to permissible behavior appurtenant thereto described in the Employee Manual.

99.    Mr. Romero performed under the employment contract, carrying out all of his duties in a manner which did not lead to any complaints about his job performance from either Members of the Club or the Club's management until August 2006.

100.    The Defendant Club breached its contractual obligation to Mr. Romero when it reduced Mr. Romero's hours over July and August, 2006 from 40 hours per week to approximately 16 hours per week.

101.    Mr. Romero has suffered damages as a result of Defendant's breach.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- awarding compensatory damages of at least $ 3,000, to be more fully determined at trial;
- granting such other relief as may be necessary and appropriate.

## COUNT V
### (COBRA)

102.    Plaintiff incorporates by reference the averments of Paragraphs 1-80, above, as if fully set forth herein.

103.    Title 29, U.S.C. § 1162(3), a provision of the Consolidated Omnibus Budget Reform Act (COBRA), limits the amount the Club can charge Mr. Romero, a former employee, for a health insurance premium to 102 percent of the applicable premium.

104.    Title 29, U.S.C. § 1162(3) provides that the Club must allow the payor, Mr. Romero, to make such premium payments in monthly installments if he so chooses.

105.    Title 29, U.S.C. § 1162 provides that in no event may the Club require the payment of any premium before the day which is 45 days after the day on which Mr. Romero, the qualified beneficiary, made the initial election for continuation coverage.

- 15 -

106.    The Club violated § 1162 by requiring that Mr. Romero pay more than 102 percent of the applicable health insurance premium for monthly coverage.

107.    The Club violated § 1162 by requiring that Mr. Romero pay more health insurance premiums for the month of October when he had already paid for coverage for that month.

108.    The Club violated § 1162 requiring that Mr. Romero pay premiums in less than 45 days after the day on which Mr. Romero made the initial election for continuation coverage.

109.    The Defendant Club violated § 1162 by requiring that Mr. Romero pay his health insurance premiums for more than one month at a time.

WHEREFORE, Plaintiff demands that a judgment be entered in his favor and against the Defendant Club:

- awarding compensatory damages be more fully determined at trial;

- awarding costs and attorneys fees; and

- granting such other relief as may be necessary and appropriate.

## JURY DEMAND

Mr. Romero requests trial by jury as to all issues in this Complaint.

Respectfully submitted,

THOMPSON HINE LLP

By: _____

Christopher "Kip" Schwartz (D.C. Bar No. 444650)
1920 N Street, N.W., Suite 800
Washington, DC 20036
202.263.4157

Counsel for Plaintiff

- 16 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT           )
SUTER'S TAVERN,                   )        Civil Action
                                  )        No. 1:06cv02181 (EGS)
        Petitioner,               )
                                  )
    v.                            )
                                  )
GILBERTO SALAMANCA                )
                                  )
        Respondent.               )
                                  )

RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 3

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005-3364
202.408.6400
202.408.6399 fax
www.sonnenschein.com

**Amy L. Bess**
202.408.6444
abess@sonnenschein.com

December 8, 2006

<u>VIA CERTIFIED MAIL</u>

Kip Schwartz, Esq.
Thompson Hine LLP
1920 N Street, NW
Washington, DC 20036-1600

> Re:  *Melaku Teferra v. The George Town Club and Laurent Lala, an individual*
> C.A. No. 0008409-06

Dear Mr. Schwartz:

In your capacity as counsel to Mr. Teferra, please be advised that The George Town Club intends to assert its rights in connection with its agreement with Mr. Teferra to arbitrate his claims in the above-referenced action which arise out of his prior employment relationship with the Club.  The Club will pursue arbitration in the American Arbitration Association, under its rules governing employment disputes.  Pursuant to the arbitration agreement between the Club and Mr. Teferra, please contact me at your earliest convenience to discuss the parties' joint selection of arbitrators.

Very truly yours,

Amy L. Bess

25191192\V-1

Brussels     Chicago     Kansas City     Los Angeles     New York     Phoenix     St. Louis     San Francisco

Short Hills, N.J.     Washington, D.C.     West Palm Beach

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT
SUTER'S TAVERN,

      Petitioner,

      v.

GILBERTO SALAMANCA

      Respondent.

Civil Action
No. 1:06cv02181 (EGS)

## RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITIONER'S MEMORANDUM IN SUPPORT OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 4

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005-3364
202.408.6400
202.408.6399 fax
www.sonnenschein.com

**Amy L. Bess**
202.408.6444
abess@sonnenschein.com

December 8, 2006

VIA CERTIFIED MAIL

Kip Schwartz, Esq.
Thompson Hine LLP
1920 N Street, NW
Washington, DC 20036-1600

Re:  *Samuel Romero v. The George Town Club*
       C.A. No. 008438 06

Dear Mr. Schwartz:

In your capacity as counsel to Mr. Romero, please be advised that The George Town Club intends to assert its rights in connection with its agreement with Mr. Romero to arbitrate his claims in the above-referenced action which arise out of his prior employment relationship with the Club. The Club will pursue arbitration in the American Arbitration Association, under its rules governing employment disputes. Pursuant to the arbitration agreement between the Club and Mr. Romero, please contact me at your earliest convenience to discuss the parties' joint selection of arbitrators.

Very truly yours,

Amy L. Bess

25191189\V-1

Brussels    Chicago    Kansas City    Los Angeles    New York    Phoenix    St. Louis    San Francisco

Short Hills, N.J.    Washington, D.C.    West Palm Beach

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE GEORGE TOWN CLUB AT SUTER'S TAVERN, | ) ) ) ) | Civil Action No. 1:06cv02181 (EGS) |
| Petitioner, | ) ) | |
| v. | ) ) | |
| GILBERTO SALAMANCA | ) ) | |
| Respondent. | ) ) | |

RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 5

# THOMPSON HINE

ATLANTA        CINCINNATI        COLUMBUS        NEW YORK

BRUSSELS        CLEVELAND        DAYTON        WASHINGTON, D.C.

December 13, 2006

**Via Facsimile**
202.408.6444

Amy Bess, Esquire
Sonnenschein Nath & Rosenthal
1301 K Street, N.W.
East Tower, Suite 600
Washington, DC 20005

     Re:    <u>The George Town Club</u>

Dear Amy:

     I am in receipt of your letter dated December 12, 2006 regarding your demand to arbitrate the three pending lawsuits. As a threshold matter, I note that you have not provided me with a signed "Acknowledgement of Employee Manual" form for Gilberto Salamanca, Bernardino Moreno or Ricky Sanchez. Is this an oversight on your part or does the Club not have signed Acknowledgements from these individuals? Until I see a signed "Acknowledgement" form by Mr. Salamanca, I cannot even consider withdrawing his Complaint and we will proceed with the Lizette Corro deposition as part of that case.

     Please know further that I do not consider Mr. Teferra's claim for assault and battery against Laurent Lala to be an employment matter, much less subject to arbitration. As such, that claim will continue under any circumstances in D.C. Superior Court.

     On a final point, I need to know from you whether these "Acknowledgements" were executed after the employees' employment had already begun. If that is the case, then what is the consideration for the purported promise to arbitrate?

     Once we have resolved these issues, I will get back to you on whether we will have to litigate a Motion to Compel Arbitration.

     Very truly yours,

     Kip Schwartz

tlr  184367.1

THOMPSON HINE LLP     1920 N Street, N.W.     www.ThompsonHine.com
ATTORNEYS AT LAW     Washington, D.C. 20036-1600     Phone 202.331.8800
     Fax  202.331.8330

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT            )
SUTER'S TAVERN,                    )
                                   )
         Petitioner,               )          Civil Action
                                   )          No. 1:06cv02181 (EGS)
      v.                           )
                                   )
GILBERTO SALAMANCA                 )
                                   )
         Respondent.               )
                                   )

RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 6

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street, N.W.
Suite 600, East Tower
Washington, D.C. 20005-3364
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Amy L. Bess
202.408.6444
abess@sonnenschein.com

December 20, 2006

VIA FACSIMILE AND FIRST CLASS MAIL

Christopher Schwartz, Esq.
Thompson Hine LLP
1920 N Street, NW
Washington, DC 20036-1600

Re:    *Gilberto Salamanca v. The George Town Club,* C.A. No. 0008375-06;
       *Samuel Romero v. The George Town Club,* C.A. No. 0008438 06;
       *Melaku Teferra v. The George Town Club and Laurent Lala, an individual*
       C.A. No. 0008409-06

Dear Kip:

Pursuant to DC Superior Court Rule 12-1(a), I request that you consent to stay the three subject actions pending a ruling by the United States District Court for the District of Columbia on The George Town Club's Petitions to Compel Arbitration to be filed under 9 U.S.C. Section 4. As you are aware, The George Town Club contends that each of your clients agreed to binding arbitration of their claims under the Federal Arbitration Act ("FAA"), and consented to the jurisdiction of the United States District Court for the District of Columbia for all purposes in connection with arbitration. Contrary to the arbitration agreements, your clients improperly filed the subject actions in The Superior Court for the District of Columbia and have refused my client's demand for arbitration in lieu of litigation, thereby forcing The George Town Club to seek an order compelling arbitration from the United States District Court since the parties agreed that jurisdiction for all purposes concerning arbitration lies in that court.

I recognize that you disagree that binding arbitration under the FAA was agreed to by your clients. However, in order to promote an orderly and efficient process that avoids unnecessary expenditure of time and resources by the parties and the DC Superior Court, I request that you agree to stay the three subject actions to permit the United States District Court to rule on the Petitions to Compel Arbitration.


SONNENSCHEIN NATH & ROSENTHAL LLP

Kip Schwartz
December 8, 2006
Page 2


It is in the interests of the parties and the court to stay the actions at this time.  However, if your clients do not agree to the requested stay, please advise me immediately and I will file the appropriate contested motions to stay the three actions.


Sincerely,

Amy L. Bess

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT
SUTER'S TAVERN,

        Petitioner,

    v.

GILBERTO SALAMANCA

        Respondent.

Civil Action
No. 1:06cv02181 (EGS)

RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 7

# THOMPSON HINE

ATLANTA    CINCINNATI    COLUMBUS    NEW YORK
BRUSSELS    CLEVELAND    DAYTON    WASHINGTON, D.C.

December 21, 2006

Amy L. Bess, Esq.
Sonnenschein, Nath & Rosenthal LLP
1301 K Street, N.W.
Washington, D.C. 20005-3364

*Via Facsimile and First-Class Mail*

RE: Gilberto Salamanca v. The George Town Club, C.A. No. 0008375-06; Samuel Romero v.
    The George Town Club, C.A. No. 0008438-06; Melaku Teferra v. The George Town Club
    and Laurent Lala, an individual, C.A. No. 0008409-06

Dear Amy:

In response to your letter dated today, I agree to voluntarily dismiss the complaint by
Samuel Romero against the George Town Club provided that we mutually agree that the case
will proceed through binding arbitration with all administrative costs of arbitration and the
arbitrator's fees to be paid by the George Town Club and no administrative costs related to the
arbitration to be paid by Mr. Romero. With respect to the complaint by Melaku Teferra, I agree
to submit all claims against the George Town Club to binding arbitration again with the
understanding that the Club will bear all administrative costs related to the arbitration. As for his
claims against Laurent Lala in his individual capacity, however, it cannot be argued that claims
for assault and battery are covered by the terms of the "Acknowledgement of Employee Manual"
and, therefore, I will proceed with those claims against Mr. Lala in DC Superior Court. I will
file an amended complaint in Mr. Teferra's case to reflect these changes.

Since you have failed to substantiate your assertion that Mr. Salamanca agreed in writing
to any arbitration of any claims against the Club, I intend to proceed with his case in DC
Superior Court and will not agree to your request for a stay in that proceeding.

Very truly yours,

Kip Schwartz

Kip.Schwartz@ThompsonHine.com   Phone 202.263.4157   Fax 202.331.8330                    184640.1

THOMPSON HINE LLP
ATTORNEYS AT LAW

1920 N Street, N.W.
Washington, D.C. 20036-1600

www.ThompsonHine.com
Phone 202.331.8800
Fax 202.331.8330

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE GEORGE TOWN CLUB AT                )
SUTER'S TAVERN,                         )
                                        )        Civil Action
            Petitioner,                 )        No. 1:06cv02181 (EGS)
                                        )
    v.                                  )
                                        )
GILBERTO SALAMANCA                      )
                                        )
            Respondent.                 )
                                        )

RESPONDENT'S MEMORANDUM IN OPPOSITION TO
PETITIONER'S MEMORANDUM IN SUPPORT
OF ITS PETITION TO COMPEL ARBITRATION

# EXHIBIT 8



Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 198115 (D.D.C.), 74 Fair Empl.Prac.Cas. (BNA) 809
**(Cite as: Not Reported in F.Supp.)**

Page 1

**C**
Briefs and Other Related Documents
Phox v. Allied Capital Advisers, Inc.D.D.C.,1997.
United States District Court,District of Columbia.
Keith PHOX, Plaintiff,
v.
ALLIED CAPITAL ADVISERS, INC., et al.,
Defendants.
**Civil Action No. 96-2745 (JR).**

April 14, 1997.

Dana W. Johnson, Gartrell & Associates, Silver
Spring, MD, for Plaintiff.
Sally D. Garr, Pillsbury, Madison & Sutro, L.L.P.,
Washington, DC, for Defendants.

*MEMORANDUM ORDER*
ROBERTSON, District Judge.
**\*1** This is an employment discrimination case
brought under Title VII. Before this Court is
defendants' motion to compel **arbitration** and for a
stay pending **arbitration.** Defendants rely upon
Section II.E of the Allied Employee Handbook.
That section establishes a conflict resolution
procedure and provides that, if a dispute is not
resolved in the employee's favor as part of the
conflict resolution procedure, "then the employee
may submit the dispute to final and binding
**arbitration....**" Defendants' Motion to Compel
and to Stay Pending **Arbitration** at Exhibit A, page
8. Defendants concede that the **handbook** did not
establish a **contract** for a particular term of
**employment,**[FN1] but they nonetheless argue that
the **arbitration** and stay they seek are compelled
because the **employee handbook** established the
terms of the **employment** relationship.

> FN1. The employee handbook provides "
> general guidance only and is not intended
> and does not constitute a contract of
> employment." *Id.* at Exhibit A, page 6.

Defendants' motion fails for at least two reasons.
First, plaintiff does not appear to have knowingly
and voluntarily entered into an agreement to
arbitrate his statutory claims. There is no evidence
that plaintiff signed the employee handbook or
otherwise acknowledged that he fully understood
and agreed to any of its provisions. Defendants
argue that plaintiff assented to Section II.E by
maintaining his job after the handbook was
distributed and by following the conflict resolution
procedures detailed in the handbook. Those
actions do not establish voluntary and intelligent
assent. *See Cole v. Burns Int'l Security Svcs.,* 105
F.3d 1465, 1479 (D.C.Cir.1996) (noting unique
concerns related to mandatory arbitration of
statutory claims imposed as a condition of
employment). The Court notes that the employee
handbook was distributed *after* plaintiff notified his
immediate supervisor and the president of Allied
Capital Corporation of his concerns about
discrimination.

Even if the employee handbook bound the parties,
the language of Section II.E is permissive, not
mandatory. It provides that, at the end of the
internal conflict resolution procedures, "the
employee may submit the dispute to final and
binding arbitration."

The defendants argue that the word "may" has "
consistently been interpreted as giving the employee
the choice either to arbitrate or abandon a claim."
Defendant's Reply to Plaintiff's Opposition at 6. The
cases on which defendants rely, however, are
distinguishable. In *Austin v. Owens-Brockway
Glass Container. Inc.,* 78 F.3d 875 (4th Cir.1996),
a collective bargaining agreement provided that "
[a]ll disputes not settled pursuant to the [internal]
procedures ... may be referred to arbitration." *Id.* at
879. The court ruled that interpreting the
arbitration provision of the collective bargaining
agreement as permissive would "render [it]
meaningless for all practical purposes." *Id.* It
would add nothing to the agreement, the court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1997 WL 198115 (D.D.C.), 74 Fair Empl.Prac.Cas. (BNA) 809
**(Cite as: Not Reported in F.Supp.)**

reasoned, if the provision was permissive because parties can always enter into binding arbitration. The difference between the language of the provision in *Austin* and the language of the employee handbook in this case is that, in *Austin,* either party could invoke the arbitration clause, whereas in this case it is the *employee* who has the option to choose arbitration. The natural reading of the provision in this case is that the employer consents to arbitration if the employee chooses to invoke it.

**\*2** *McCrea v. Doctors Copeland, Hyman & Shackman.,P.A.,* 945 F.Supp. 879 (D.Md.1996), is even more clearly distinguished on its facts. That arbitration provision was included in an employment contract in which the parties "mutually promise[d] and agree [d] that if any controversy or dispute relating to this Agreement arises between them ..., either party may petition the appropriate court of the state of Maryland for an order compelling the submission of that controversy or dispute to arbitration...." *Id.* at 881. As in *Austin,* the arbitration provision in *McCrea* would be superfluous if it were interpreted to permit, rather than require, the parties to arbitrate if any party demanded it.

Accordingly, it is this day of April, 1997

ORDERED that defendants' motion to compel arbitration and stay pending arbitration [# 4] is denied. It is

FURTHER ORDERED that the parties meet for a Rule 206 conference and present this Court with a report at the next status conference, which will be held on April 28, 1997 at 9:00 a.m.

D.D.C.,1997.
Phox v. Allied Capital Advisers, Inc.
Not Reported in F.Supp., 1997 WL 198115 (D.D.C.), 74 Fair Empl.Prac.Cas. (BNA) 809

Briefs and Other Related Documents (Back to top)

• 1:96cv02745 (Docket) (Dec. 12, 1996)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **THE GEORGE TOWN CLUB AT SUTER'S TAVERN,** ) ) ) ) | **Civil Action No. 1:06cv02181 (EGS)** |
| **Petitioner,** ) ) | |
| **v.** ) ) | |
| **GILBERTO SALAMANCA** ) ) | |
| **Respondent.** ) ) | |

## <u>ORDER</u>

Upon consideration of the Petition to Compel Arbitration, Respondent's Answer and Opposition to the Petition, Petitioner's Memorandum in Support of its Petition to Compel Arbitration, Respondent's Memorandum in Opposition, and Petitioner's Reply, the parties having been heard, it is hereby Ordered that the Petition to Compel Arbitration is DENIED and hereby DISMISSED.

SO ORDERED this ___ day of _____, 2007.

_____
Emmet G. Sullivan
United States District Court Judge
